COMMONWEALTH of Pennsylvania,
Appellee

v.

Americo T. RIVERA, Appellant.

Superior Court of Pennsylvania.

Submitted Oct. 7, 2002.
Filed Jan. 23, 2003.

---

Vincent J. Quinn, Lancaster, for appellant.

Donald R. Totaro, Assistant District Attorney, Lancaster, for Com., appellee.

Before: MUSMANNO, GRACI, and MONTEMURO *, JJ.

GRACI, J.

¶ 1 Appellant, Americo T. Rivera ("Rivera"), appeals from an order entered in the Court of Common Pleas of Lancaster County on December 20, 2001, denying his petition for relief pursuant to the Post

---

* Retired Justice assigned to the Superior Court.

Conviction Relief Act, 42 Pa.C.S.A. §§ 9541–9546 ("PCRA"). We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

¶ 2 The relevant facts in this case were aptly summarized by this Court in its Memorandum decision of July 28, 1997:

On May 4, [1995], at approximately 8:20 p.m., Detective Gregory P. Macey of the Lancaster Bureau of Police, along with twelve (12) other officers, executed a search warrant for the premises at 504 South Prince Street, Lancaster, Pennsylvania. Detective Macey knocked on the door and waited twenty (20) seconds before a Spanish male came to the door. Detective Macey claimed that the Spanish male later moved away from the door. As a result of the individual's failure to open the door, Detective Macey used a battering ram to strike and open the door.

When Detective Macey entered, he saw several people running toward the back of the residence. Also, Detective Macey said he heard people running up the steps to the second floor. When Detective Macey arrived on the third floor, Detective Jan Walters was holding Mr. Rivera. Detective Macey saw three people on the roof of the third floor.

When all occupants of the residence were downstairs in the livingroom, Detective Macey read the search warrant. Then, Ms. Sandra Rivera, Mr. Rivera's mother arrived home. Detective Macey claimed that he read *Miranda* rights off a card to all the occupants. According to Detective Macey, Mr. Rivera stated: "Anything you find in the house is mine" and "anything you find here I'll take responsibility for." Detective Macey explained in his testimony that the statement was made prior to the search.

While all the occupants of the residence were seated in the living room, Detective Macey threatened to charge Ms. Rivera with constructive possession. At that point, Antonio Mendoza, Mr. Rivera's younger brother, led police to the second floor hallway closet. Mr. Mendoza said: "The sh-t is mine, I'll show you where it is." He then pointed out a blue first-aid kit in the hallway closet.

Memorandum, 7/28/97, at 1–3 (quoting Appellant's Brief). A search of the blue first aid kit revealed the following items: a binocular pouch containing thirty-two clear plastic knotted bags, each containing approximately 1.3 grams of cocaine; one clear plastic bag containing several small pieces of suspected crack cocaine; one box of clear plastic sandwich bags identical to the ones used to package the cocaine; two single edged razor blades with crack cocaine residue on the blades; approximately twenty small red-tinted Ziploc bags commonly used in the packaging of controlled substances; and an electronic gram scale. N.T. Trial, 3/19/96, at 34:10–23, 37:18. The officers did not recover money or drugs from Mr. Rivera's person. *Id.* at 70:23–71:5. Rivera was arrested and charged with possession with intent to deliver cocaine, 35 Pa.C.S.A. § 780–113(a)(30), and criminal conspiracy, 18 Pa.C.S.A. § 903(a)(1).

¶ 3 Rivera was convicted by a jury of both charges and on May 10, 1996, was sentenced to an aggregate term of imprisonment of eight to twenty years. Trial counsel did not file post-trial or post-sentence motions on Rivera's behalf.

¶ 4 Following the entry of appearance by appellate counsel, Rivera filed a timely notice of appeal to this Court on June 10, 1996, claiming that (1) trial counsel had rendered ineffective assistance, (2) the evidence presented at trial was insufficient to sustain his conviction, and (3) his sentence

was excessive and based upon improper considerations. This Court affirmed the judgment of sentence in an unpublished memorandum decision filed on July 28, 1997. Rivera did not seek further direct appellate review.

¶ 5 Rivera filed his first PCRA petition, *pro se,* on June 19, 1998. The PCRA court assigned Rivera's case to the Lancaster County Public Defender's Office. The public defender assigned to the case filed a motion to withdraw based upon his determination that "no arguable meritorious issues exist which may entitle [Rivera] to post-conviction relief." Motion To Withdraw As Counsel, at 1. On September 30, 1998, the PCRA court granted the withdrawal motion and entered notice of its intent to dismiss Rivera's PCRA petition. The petition was formally dismissed without a hearing on October 30, 1998.

¶ 6 Rivera filed a second PCRA petition, *pro se,* on November 30, 2000. On January 2, 2001, the PCRA court entered an order granting Rivera leave to seek post-conviction relief and appointing new counsel to represent him. In its order, the PCRA court (1) acknowledged that Rivera had not been advised of his right to appeal the dismissal of his first PCRA petition, and (2) granted counsel "45 days to file any amended application in which shall be raised all claims for relief, which shall include any claims on which [Rivera] continues to rely that were raised in his first PCRA petition." Order, 1/2/01. PCRA counsel filed an amended PCRA petition on Rivera's behalf contending that trial counsel had been ineffective in failing to object to certain alleged hearsay testimony, in pursuing a line of questioning that compounded the impact of such testimony, and in failing to request a hearing on the voluntariness of Rivera's alleged confession.

¶ 7 The PCRA court conducted a hearing and subsequently entered an order denying Rivera's petition for post-conviction relief on December 20, 2001. In its accompanying memorandum, the PCRA court specifically found that the issues raised had been previously litigated. Rivera filed a *pro se* notice of appeal from the PCRA court's order and present counsel was appointed on April 1, 2002.

¶ 8 In this appeal, Rivera presents two issues, neither of which were presented in the PCRA court: that his trial counsel was ineffective for (1) failing to file a meritorious motion to suppress evidence, and (2) failing to object to the improper impeachment of defense witness Antonio Mendoza. With respect to both of these issues, Rivera also argues that his direct appeal counsel, first PCRA counsel and second PCRA counsel rendered ineffective assistance by failing to preserve and raise the aforementioned claims.

## II. DISCUSSION

¶ 9 At the outset it is necessary to clarify the procedural posture of this case. Rivera's first PCRA petition, which he filed *pro se* on June 19, 1998, was timely filed within one year of August 28, 1997, the date his judgment of sentence became final. *See* 42 Pa.C.S.A. § 9545(b). The PCRA petition underlying the present appeal, which Rivera filed on November 30, 2000, would appear to be an untimely second petition. However, this Court has held that

> every PCRA petitioner ... is entitled to meaningful appellate review of post-conviction claims raised in his first petition so long as that petition is timely filed. Where the dereliction of counsel *or other circumstances for which the defendant is not responsible operate to waive those claims,* the defendant's right to review remains to be dis-

charged. Consequently, when the defendant restates those claims in a second or subsequent PCRA petition that would be otherwise time-barred, we are compelled to recognize that the later petition is not an unentitled "second bite at the apple," but merely the first bite that he was unlawfully denied.

*Commonwealth v. Ceo*, 812 A.2d 1263 (Pa.Super.2002) (emphasis added) (citation omitted). *See also Commonwealth v. Leasa*, 759 A.2d 941 (Pa.Super.2000) (where counsel's failure to file a brief prejudiced petitioner's rights under the PCRA, upon filing of appellant's "second" PCRA petition PCRA court properly granted appellant relief in the form of a *nunc pro tunc* appeal from the denial of his first petition and the appointment of counsel for purposes of instant appeal).

¶ 10 Here, the PCRA court's order of January 2, 2001, acknowledged that Rivera was never advised of his right to appeal the dismissal of his first PCRA petition. The court also granted counsel "45 days to file any amended application in which shall be raised all claims for relief, which shall include any claims on which [Rivera] continues to rely that were raised in his first PCRA petition." Order, 1/2/01. The amended PCRA petition filed on Rivera's behalf, which we now characterize as his first PCRA petition, was denied on December 20, 2001, following a hearing. In light of the above, we shall treat Rivera's present appeal as an appeal from the denial of his first PCRA petition and review the merits of the issues raised therein.

¶ 11 When reviewing the denial of post-conviction relief, this Court is limited to "examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516, 520 (1997) (citation omitted). "To be eligible for relief under the PCRA, a petitioner must establish, as a threshold matter, that his allegations have not been waived." *Commonwealth v. Abdul–Salaam*, 808 A.2d 558, 560 (Pa. 2001). "An allegation is deemed waived 'if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review [or] on appeal....' " 42 Pa. C.S.A. § 9544(b). "A petitioner can avoid a finding of waiver under the PCRA by making an adequate and properly layered claim of ineffective assistance of counsel at his first available opportunity to do so." *Abdul–Salaam*, 808 A.2d at 560 n. 3 (citation omitted). An adequate and properly layered claim must contain more than boilerplate assertions of prior counsel's ineffectiveness, because "[s]uch an undeveloped argument, which fails to meaningfully discuss and apply the standard governing the review of ineffectiveness claims, simply does not satisfy Appellant's burden of establishing that he is entitled to any relief." *Id.*

¶ 12 This appeal represents Rivera's first opportunity to challenge the effectiveness of prior PCRA counsel [1] with

1. In *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), our Supreme Court recognized that a PCRA petitioner's right to appointed counsel, guaranteed by Pennsylvania Rule of Criminal Procedure 904, requires "an enforceable right to effective post-conviction counsel." *Id.* at 700. Therefore, PCRA counsel's assistance may be examined on appeal from the denial of PCRA relief. *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 303 (1999). Claims of PCRA counsel's ineffectiveness must be raised at the first opportunity at which the defendant is represented by counsel other than the attorney whose effectiveness is challenged. *Id.* at 302–303, fn. 6. We recognize that the Supreme Court recently decided *Commonwealth v. Grant*, —— Pa. ——, 813 A.2d 726 (2002), holding that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of *trial* coun-

respect to the preservation and litigation of the two substantive issues advanced herein. In his first issue, Rivera argues that trial counsel was ineffective in failing to file a motion to suppress the evidence seized during the search of Rivera's residence, namely the cocaine, other items seized, and inculpatory statements made by Rivera. Brief for Appellant, at 16. Rivera then argues that his direct appeal counsel as well as his two previous PCRA attorneys rendered ineffective assistance by failing to preserve and raise this issue.[2] By so arguing, Rivera has set forth an adequate and properly layered claim of ineffective assistance of counsel.

¶ 13 Our analysis of Rivera's claim is guided by the following well-settled principles:

> To prevail on a claim alleging counsel's ineffectiveness under the PCRA, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without any reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness, i.e. there is a reasonable probability that but for the act or omission in question the outcome of the proceeding would have been different.

*Id.* at 561 (citations omitted).

■ ¶ 14 We must first determine if Rivera's underlying claim is of arguable merit. Rivera contends that, on its face,

the search warrant executed by the police at the time of his arrest was both overbroad and lacking in particularity with respect to its description of the items to be seized. Rivera also argues that the affidavit submitted in support of the warrant did not set forth the requisite probable cause. As these technically separate issues are closely intertwined, we shall address them together.

¶ 15 Detective Gregory Macey, affiant, obtained and executed the search warrant on May 4, 1995. The warrant identified the following items to be searched for and seized:

> Controlled Substances, as defined by the PA Controlled Substances, Drug, Device & Cosmetic Act of 1972. Specifically, but not limited to Cocaine, a Schedule II Controlled Substance. Also, any assets, paraphernalia or other materials related to the sale or use of same. Additionally, any documents showing occupancy of the residence to be searched, curtilage and any persons who may engage in illegal drug activity.

Search Warrant and Affidavit K26155, 5/4/95. The warrant identified 504 South Prince Street, Lancaster, PA, as the premises to be searched and the situs of an "ongoing" violation of the Controlled Substances, Drug, Device & Cosmetic Act of 1972. The warrant further identified Rivera and his brother, Antonio Mendoza, as

sel until collateral review." *Id.* at 738 (emphasis added). This new rule applies to all cases "on *direct* appeal where the issue of ineffectiveness was properly raised and preserved." *Id.* at 738 (emphasis added). As Rivera's case is not on direct review, *Grant* does not apply. Different from the appellant in *Grant*, who was on direct appeal from his judgment of sentence and had remedies available to him in a timely-filed PCRA petition, *id.*, Rivera is on appeal from the denial of PCRA relief. Moreover, while he layers his claims to reach back to the alleged failings of

his trial (and all subsequent) counsel, this appeal from the denial of PCRA relief is Rivera's first (and only) opportunity to challenge the effectiveness of his PCRA counsel.

2. In his direct appeal, Rivera assailed the performance of trial counsel on a number of other grounds. The lawfulness of the search warrant, and trial counsel's failure to file a motion to suppress the evidence obtained pursuant to that warrant, have not been previously raised.

the owners, occupants or possessors of the premises to be searched. In this appeal, Rivera takes issue with the language "any assets, paraphernalia, or other materials related to the sale or use of same." Brief for Appellant, at 20.

¶ 16 The affidavit in support of the search warrant stated that probable cause was based upon the following facts and circumstances, which we quote in its entirety:

1) That your affiant has been a member of the [Lancaster] City Police Department since June of 1987. Your affiant has attended the Johnstown Regional Police Academy and graduated from same receiving training in controlled substances, identification and prosecutions of [the PA Controlled Substances, Drug, Device & Cosmetic Act of 1972]. Your affiant since 1987 has undergone intensive field training on controlled substances recognition, effects of controlled substances, packaging of controlled substances, sales of controlled substances including pricing. Based upon that training your affiant has participated in approx. 500 drug related investigations, either as a witness or prosecuting officer. Said investigations having resulted in numerous seizures and controlled substance arrests and convictions for the violation of the [PA Controlled Substances, Drug, Device & Cosmetic Act of 1972]. During the month of May 1992 your affiant has been assigned as County Detective with the [Lancaster] County DA's Drug Task Force. During the month of March 1992 your affiant has assisted members of the Lancaster Drug Task Force in ongoing drug investigations and has had updated training by members of the Lancaster County Drug Task Force. Det. Macey has also attended the following schools: BNI Drug Interdiction School, U.S. Army Tactical Training, Pa.

State Police Electronic Surveillance Class A School, two week DEA Drug Investigation School.

2) That during the month of April 1995 Det. Macey received information from a confidential informant who has provided information that has led to arrests & convictions in the past, regarding several young spanish males who are in the business of selling crack/cocaine by weight from 504 South Prince Street, Lancaster City, PA. This informant knew this information to be true due to the fact that he/she has purchased crack/cocaine from these spanish males at this this [sic] residence.

3) That during the month of April 1995 Det. Macey and the Lancaster Bureau of Police received an anonymous complaint from a concerned citizen who lives in the 500 block of South Prince Street, Lancaster, PA. The citizen stated his/her concerns of drug dealing occurring at 504 South Prince Street, Lancaster, PA. The citizen further stated he/she observed frequent foot and vehicle traffic in and out of this residence, usually during the later evening hours of the day.

4) As a result of this information Det. Macey and Det. Bonilla conducted a surveillance of 504 South Prince Street, Lancaster, PA, during the week of 23 April 1995. During this surveillance these officers observed a large amount of pedestrian and bicycle traffic in and out of this residence, consistent with drug trafficking. Det. Macey also noticed a white four door sedan bearing New York registration parked in front of this residence. Det. Macey later learned from a second confidential informant that the crack/cocaine was being transported from New York City to 504 South Prince Street, Lancaster, PA., in this vehicle.

5) That during the month of April 1995 Detectives Macey and Bonilla met with the second confidential informant, mentioned in # [3]. This confidential informant has provided information that has led to arrests and seizures of controlled substances. During this meeting the informant stated that he/she had personal knowledge of controlled substances being sold from 504 South Prince Street, Lancaster, Pa. The informant knew this to be true due to the fact he/she had made several purchases of crack/cocaine from this residence in the past. This informant stated that the drugs were being sold by two brothers known to him as Antonio Mendoza and Americo Rivera. The informant stated that every few days a spanish male from New York City transports a quantity of crack/cocaine to this residence in a white four door sedan bearing New York registration.

6) Based upon the above information, within a 24 to 36 hour period of the application of this search warrant, Detectives Macey and Bonilla met with the informant mentioned in # [3] and # [4] and made a controlled purchase of a quantity of crack/cocaine from 504 South Prince Street, Lancaster City, Pa. using funds provided by these Officers and under the direction of these Officers. The CI also related he/she observed additional quantities of crack/cocaine in the residence, for sale.

7) That after the controlled purchase the suspected cocaine was field tested by your affiant with positive results or [sic] the presence of cocaine.

8) Based upon the above information this Officer respectfully requests this search warrant be granted for 504 South Prince Street, Lancaster City, Pa.

Search Warrant and Affidavit K26155, 5/4/95.

¶ 17 In assessing the lawfulness of the warrant, we are guided by this Court's previous summarization of state and federal jurisprudence on the subject:

> It is a fundamental rule of law that a warrant must name or describe with particularity the property to be seized and the person or place to be searched.... The particularity requirement prohibits a warrant that is not particular enough and a warrant that is overbroad. These are two separate, though related, issues. A warrant unconstitutional for its lack of particularity authorizes a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize. This will result in the general "rummaging" banned by the fourth amendment. *See Marron v. United States,* 275 U.S. 192, 195, 48 S.Ct. 74, 75, 72 L.Ed. 231 (1927). A warrant unconstitutional for its overbreadth authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation... An overbroad warrant is unconstitutional because it authorizes a general search and seizure.

> . . . .

> The language of the Pennsylvania Constitution requires that a warrant describe the items to be seized "as nearly as may be...." The clear meaning of the language is that a warrant must describe the items as specifically as is reasonably possible. This requirement is more stringent than that of the Fourth Amendment, which merely requires particularity in the description. The Pennsylvania Constitution further requires the description to be as particular as is reasonably possible.... Consequently, in any assessment of the va-

lidity of the description contained in a warrant, a court must initially determine for what items probable cause existed. The sufficiency of the description must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. An unreasonable discrepancy reveals that the description was not as specific as was reasonably possible.

*Commonwealth v. Bagley,* 408 Pa.Super. 188, 596 A.2d 811, 814–815 (1991), *appeal denied,* 531 Pa. 637, 611 A.2d 710 (1992), *cert. denied, Bagley v. Pennsylvania,* 506 U.S. 1002, 113 S.Ct. 606, 121 L.Ed.2d 541 (1992) (citations omitted). *See also* Pa. R.Crim.P. 205 (Contents of Search Warrant), 206 (Contents of Application for Search Warrant).

¶ 18 The legal principles applicable when reviewing the sufficiency of an affidavit to determine whether it establishes the probable cause necessary for the issuance of a warrant are also well established.

Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. (citations omitted) The information offered to demonstrate probable cause must be viewed in a common sense, nontechnical, ungrudging and positive manner. (citations omitted) It must also be remembered that probable cause is based on a finding of the probability, not a *prima facie* showing of criminal activity, and that deference is to be accorded a magistrate's finding of probable cause. (citations omitted)

Hearsay information is sufficient to form the basis of a warrant so long as the magistrate has been provided with sufficient information to make a "neutral" and "detached" decision about whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for ... concluding that probable cause existed."

*Commonwealth v. Baker,* 532 Pa. 121, 615 A.2d 23, 25 (1992) (quoting *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985)), citing *Illinois v. Gates,* 462 U.S. 213, at 236, 103 S.Ct. 2317, at 2332, 76 L.Ed.2d 527, at 547 (1983).

¶ 19 Here, the affidavit of Detective Macey stated that two confidential informants, both of whom had given reliable information in the past, had informed him that they had purchased cocaine from two young Spanish males at Rivera's residence in the month preceding the application for the warrant. One of the informants also stated that cocaine was being transported to the premises by a white sedan bearing New York registration. The police observed such a vehicle parked in front of the residence during the week before the search warrant was sought, obtained and executed. During the same time period, a neighbor had also complained to police about frequent foot and vehicle traffic in and out of the residence and expressed concerns regarding drug-dealing .there. This information was corroborated by police surveillance of the residence and through a controlled buy of cocaine by one of the confidential informants within 24 to 36 hours of application for the warrant. Applying the "totality of the circumstances" test, we find that the issuing authority had a substantial basis for concluding that probable cause existed that cocaine and items related to the sale and

possession thereof would be found in Rivera's residence.

▮▮ ¶ 20 Measuring the sufficiency of the description in the warrant against those items for which probable cause existed, we find that the warrant was neither overbroad nor lacking in specificity. As stated above, there was probable cause to believe cocaine was being possessed and sold by the occupants of the premises. The warrant authorizing police to search for and seize evidence of same, including "any assets, paraphernalia or other materials related to the sale or use of" cocaine, was not, as Rivera argues, a general investigatory tool proscribed by Article 1, Section 8 of the Pennsylvania Constitution and the Fourth Amendment.

¶ 21 Rivera's reliance upon this Court's decisions in *Commonwealth v. McEnany*, 446 Pa.Super. 609, 667 A.2d 1143 (1995) and *Commonwealth v. Bagley, supra* is unpersuasive. In *McEnany*, we noted that a warrant to search the defendant's van was defective on its face where its stated purpose was "searching and seizing any trace evidence including, but not limited to: blood, hairs, fibers, glass, paint, and any other contraband or evidence related to this crime [homicide]." *McEnany*, 667 A.2d at 1148. In *Bagley*, "the warrant stated no crime but suggested only that it had been issued in the investigation of a suspicious death. It authorized police to seize *anything* that *may* have been related to Mrs. Bagley's death." *Bagley*, 596 A.2d at 815 (emphasis original). In both of these cases, the warrant at issue was clearly the kind of general investigatory tool prohibited under our state and federal constitutions. Rivera's case is readily distinguishable. Here, the police were searching for evidence related to the possession and sale of cocaine. The language "or other materials," which Rivera compares to that proscribed by *McEnany* and *Bagley*, follows the specific items "assets" and "paraphernalia," all of which must be related to a specifically defined crime: the sale or use of cocaine—crimes for which the police clearly had probable cause to believe had occurred at the residence within 24 to 36 hours preceding execution of the warrant. Moreover, we note that the language of the warrant was sufficiently specific given the nature of narcotics investigations, which are qualitatively different from homicide investigations.

▮▮ ¶ 22 With respect to the layered claims of ineffective assistance of counsel before us, we find that the suppression issues raised by Rivera fail to set forth an underlying claim of arguable merit. "[I]t is axiomatic that [trial] counsel will not be considered ineffective for failing to pursue meritless claims." *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 304 (1999), *reargument denied* (citation omitted). Additionally, "[p]ost-trial counsel will not be deemed ineffective for failing to raise and preserve meritless challenges to the effectiveness of trial counsel." *Commonwealth v. Thuy*, 424 Pa.Super. 482, 623 A.2d 327, 335 (1993) (citations omitted). Rivera's first issue fails.

▮▮ ¶ 23 Turning to Rivera's second and final ineffective assistance claim, he argues that trial counsel was ineffective in failing to object to the Commonwealth's improper impeachment of Antonio Mendoza using prior juvenile adjudications. Rivera then argues, as he did in his first issue, that his direct appeal counsel and prior PCRA attorneys all rendered ineffective assistance by failing to preserve and litigate this claim.

¶ 24 To reiterate, this is Rivera's first opportunity to assail the performance of his prior PCRA counsel and he has set forth an adequate and properly layered claim of ineffective assistance of counsel.

The underlying issue regarding the Commonwealth's impeachment of defense witness Mendoza has not been previously raised, nor has it been waived. Accordingly, we may proceed to the tripartite analysis set forth in *Abdul–Salaam, supra,* requiring a petitioner alleging ineffective assistance of counsel to "demonstrate (1) that the underlying claim was of arguable merit, (2) that counsel's course of conduct was without reasonable basis designed to effectuate his client's interest, and (3) that he was prejudiced by counsel's ineffectiveness...."

¶ 25 It is well established that the credibility of a witness may be impeached through the use of any relevant evidence, including examination of the witness concerning prior inconsistent statements. Pa. R.E. 607, 613.[3] There are several principal ways to attack a witness' credibility, including evidence offered to contradict the witness' testimony. *In Interest of M.M.,* 439 Pa.Super. 307, 653 A.2d 1271, 1276 (1995), *affirmed,* 547 Pa. 237, 690 A.2d 175 (1997) (citing Leonard Packel & Anne Poulin, *Pennsylvania Evidence* § 608 (1987)). *See also Commonwealth v. Baez,* 494 Pa. 388, 431 A.2d 909, 912 (1981) ("[t]he credibility of a witness may be impeached ... by showing that on a prior occasion he made a statement, either oral or written, that is inconsistent with his present testimony....") (citation omitted).

¶ 26 In this case, the primary defense strategy was to suggest that the cocaine discovered in Rivera's residence belonged to Mendoza. Rivera's attorney elicited testimony to that end from Mendoza, Rivera himself, and their mother. On direct examination, trial counsel elicited the following testimony from Mendoza regarding the events of May 4, 1995:

Q. Did anything unusual happen on that day, sir?

A. Yeah.

Q. And what happened?

A. [Detective] Macey and a couple of his friends came in my house and took me and my brother for something that was mine.

Q. Something that was whose?

A. Mine.

Q. What did they take?

A. They caught us with cocaine.

Q. Whose cocaine was it?

A. It was mine because I had owed somebody money so I had got it to pay them back.

(4)27

Q. Who was going to deal exclusively with the selling of that?

A. Me. It was me that was selling. I did it late at night like when Joe leave, when my brother would leave

---

3. Rivera argues that the Commonwealth improperly impeached his brother and coconspirator, Antonio Mendoza, with the juvenile adjudication entered against Mendoza as a result of his involvement in the drug trafficking activities described above. Rivera argues that such impeachment was improper because the offenses for which Mendoza was adjudicated delinquent were not *"crimen falsi."* Brief for Appellant, at 27. We reject this argument since it is clear that the Commonwealth did not impeach Mendoza through the use of his prior juvenile adjudication. As will be demonstrated *infra,* Mendoza was impeached with his prior inconsistent statements. We also reject Rivera's argument based upon improper use of "evidence of prior crimes." *Id.* at 28. The body of caselaw on which this argument is predicated involves evidence of prior crimes committed by the defendant on trial. The examination of Mendoza implicated Rivera in no prior criminal activity. Instead, it involved only Mendoza's involvement in the conspiratorial activities for which Rivera was then on trial and in which Mendoza had previously admitted his participation.

with his girlfriend and my mother go to work. I would sell it. I would sell it from my backyard.

Q. Did Mr. Rivera know about it?

A. He didn't—no. He didn't know. He knew like he assumed it but I didn't tell him.

Q. How old a fellow are you?

A. Who me? I'm 18.

Q. And how old were you back on May 4th?

A. Seventeen. I still got to go to court and everything for this yet.

Q. What happened to you after you admitted?

A. They told us where the stuff was and I told him or they were going to take my mom so I had to tell them so then I told them where it was at. I took Macey upstairs. I showed him where it was because they had asked [Rivera] and he didn't know where it was so I said, I'll tell you. I take [Detective] Macey upstairs. I show him where it at. I said, I don't have nothing else. He took me back downstairs, handcuffed me, took everything out of my pocket, took me to the police station and fingerprinted me. They had me in the cell for like an hour and then they took me to Barnes Hall.

Q. Were you charged as a result of this?

A. Yeah, I was charged.

Q. Do you know what charges that you had that were lodged against you?

A. Yeah, attempted to deliver, possession of cocaine and something—all the stuff that was in there they charged me with, that was in the box.

N.T. Trial, 3/20/96, at 130:4–15, 131:20–133:1. On cross-examination, the Commonwealth's attorney questioned Mendoza as follows:

Q. You already went to court for this, didn't you?

A. No. I still got to go to court.

Q. You were charged at the same time as your brother with possession with intent to deliver cocaine, right?

A. Yes.

Q. You were also charged with criminal conspiracy, conspiring with your brother to possess with intent to deliver cocaine, right?

A. I guess.

Id. at 142:1–9. In order to highlight the apparent contradiction in Mendoza's testimony, the Commonwealth's attorney read the following portions of the allegation form and Mendoza's adjudication order into the record:

Q. ... Actor did conspire with his brother, Americo Rivera, that they would engage in conduct which would constitute the crime of possession of cocaine with intent to deliver.

Actor did conspire with Rivera that they would possess 42 grams of crack cocaine with the intent to deliver same at 504 South Prince Street. That was one of the charges you were charged with, conspiring with your brother to possess with intent to deliver cocaine, right?

A. Yeah, but can I ask you a question?

Q. No.

A. When did I say that it was mine and his?

Q. Well, I'm getting to that. Here's an adjudication dated May 15, 1995, Judge Stengel, And Now, this 15th day of May, 1995, the Court finds beyond a reasonable doubt that Antonio Mendoza, a juvenile, has committed the acts described, which offenses, if he were an adult, would

constitute the crimes of possession with intent to deliver cocaine, criminal conspiracy and the two other charges. The Court bases this finding on the admission of the juvenile with the knowledge and consent of his mother.

In fact, on May 15th, 1995, you admitted in court that you conspired with your brother to possess with intent to deliver drugs.

A. No. When I was in court, I said, everything is mine. My brother had nothing to do with it. I even told the Judge. You can ask [Judge] Stengel. You can ask him. He even knows that I said my brother didn't have nothing to do with it, why you guys got my brother.

Q. Judge Stengel?

A. I think that's his name. I don't remember.

Q. You were in front of Judge Stengel?

A. Yes. You can ask my probation officer. He was there.

Q. Well, the sealed adjudication says, you admitted on May 15th to conspiring with your brother.

A. I admitted all the drugs are mine. I went in there and said, everything is mine.

Q. On May 15th, you admitted that you conspired with your brother to possess these drugs but now you're saying it was all yours?

A. I don't know. I know I went in there and admitted everything was mine, everything.

*Id.* at 143:18–145:9.

¶ 27 Mendoza's admission in juvenile court that he had conspired with Rivera to possess and distribute the cocaine clearly contradicted his testimony on direct examination that Rivera had no knowledge of the drugs. The Commonwealth was entitled to impeach Mendoza's credibility by highlighting this blatant contradiction between his prior statements and his present testimony. Mendoza also testified on direct examination that he had not yet appeared in court regarding the underlying offense when, in fact, he had been adjudicated delinquent on the charges nearly one year earlier. Rivera's trial counsel can not be deemed ineffective for failing to object to what was clearly admissible impeachment evidence. Likewise, successor counsel can not be deemed ineffective for failing to preserve and litigate a meritless claim. Having found no merit to Rivera's underlying claim, we reject his second allegation of ineffective assistance of counsel.

### III. CONCLUSION

¶ 28 We have reviewed the two claims of ineffective assistance of counsel asserted by Rivera in this appeal and find no underlying merit to either claim. Appellate counsel and prior PCRA counsel were, therefore, not ineffective in failing to assert either of these claims on Rivera's behalf. Accordingly, the order of the PCRA court denying Rivera's petition for post-conviction relief is affirmed.

¶ 29 Order denying PCRA relief affirmed.